IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROBERT McCUTCHEN,
Plaintiff,

3:12-CV-1002-PK

OPINION AND
v.                                                    ORDER

CAROLYN COLVIN,
Commissioner of Social Security,

Defendant.

PAPAK, Magistrate Judge:

Claimant Robert McCutchen filed this action on October 29, 2012, seeking judicial

review of the Social Security Commissioner's final decision denying his application for disability

insurance benefits ("benefits") under Title II of the Social Security Act (the "Act"). This court

has jurisdiction to review this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). I have

considered all of the parties' briefs and all of the evidence in the administrative record. For the

reasons set forth below, the Commissioner's decision is AFFIRMED.

///

## DISABILITY ANALYSIS FRAMEWORK

To establish a disability within the meaning of the Social Security Act, a claimant must demonstrate that he or she cannot "engage in any substantial gainful activity [because of a] medically determinable physical or mental impairment which can be expected.... to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process to determine whether a claimant meets this burden. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. § 404.1520(a)(4). During the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge ("ALJ") considers whether the claimant is engaged in substantial work activity. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. § 404.1520(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b). Otherwise, the evaluation will proceed to the second step.

The ALJ examines the severity of the claimant's impairments at the second step. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration

requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, where the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. § 404.1520(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related physical and mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. §§ 404.1545(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 404.1520(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f). In the event the claimant

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof shifts to the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the claimant's RFC in relation to the claimant's age, education, and work experience to determine whether he or she can perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566. If the Commissioner meets her burden to demonstrate that the claimant is capable of performing jobs existing in significant numbers in the national economy, the claimant is found not disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566. A claimant will be found entitled to benefits if the Commissioner fails to meet her burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r for Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id., citing Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of

the Commissioner. *See id.*, citing *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir.

2006); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the ALJ's

interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible

[of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir.

1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## BACKGROUND

Robert McCutchen was born on September 5, 1960. Tr. 73.[2] He graduated high school

in 1979, and earned a jeweler's certification in 1986. Tr. 155. He has never used this jeweler's

training professionally. Tr. 205. McCutchen has worked as a construction laborer, painter,

delivery driver, and welder's helper. Tr. 38, 158, 160. From 1987 to 2002, McCutchen struggled

with an addiction to methamphetamine, cocaine, and alcohol, which affected his ability to work.

Tr. 470-475. Since 2002, he has been sober. Tr. 475.

McCutchen has experienced several episodes of depression during the past 20 years. Tr.

44. When severely depressed, he remains bedridden for several days. Tr. 45. His sister Janice

McCutchen ("Janice") has witnessed these symptoms, and in support of McCutchen's claim

herein she described several of McCutchen's depressive episodes from 1990 to 2001, and again

in 2009. Tr. 199-200. To combat this depression, McCutchen has been treated with

antidepressants prescribed by his physician. Tr. 219. This medication has occasionally helped.

Tr. 45.

From 2000 to 2007, McCutchen worked as a welder's helper, where he "drove [a] hoister,

ran cranes, stuffed tubes, prepped parts" and lifted more than 45 pounds. Tr. 151, 37-38. While

at work on June 4, 2007, McCutchen sprained his back lifting a 4x4. Tr. 218. He visited his

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative
record filed herein as Docket No. 12.

primary care physician, Dr. Cummings, the next day. Dr. Cummings diagnosed McCutchen's sprained back, and prescribed Aleve twice daily. Tr. 218. Dr. Cummings also recommended that McCutchen take a week's leave of absence, pending further evaluation. Tr. 218.

During a follow-up appointment on June 12, 2007, Dr. Cummings determined that McCutchen was twenty-five percent better. However, McCutchen continued to feel stiff and tender. Dr. Cummings recommended physical therapy twice a week for two weeks, and that McCutchen obtain permission to take an additional week of absence from work. Tr. 218. One week later, McCutchen returned to Dr. Cumming's office. Dr. Cummings concluded that McCutchen's condition had improved, although McCutchen reported some pain near his pelvis. Tr. 313. Dr. Cummings advised McCutchen to take a third week of absence from work and to continue physical therapy. He also expressed the opinion that McCutchen would likely be able to return to work after this third week of absence. Tr. 313.

Dr. Cummings next saw McCutchen on June 26, 2007. McCutchen seemed to have recuperated, though he reported that some tenderness lingered. Tr. 313. Due to his improved condition, Dr. Cummings cleared McCutchen to work without restriction, beginning the next day. Tr. 313. He instructed McCutchen to make appointments as needed. McCutchen returned to work on June 27, 2007. Tr. 313.

On July 9, 2007, McCutchen returned to Dr. Cummings' office, complaining of back and leg pain. McCutchen described feeling discomfort while lifting one leg. Dr. Cummings suggested that McCutchen continue physical therapy for another two weeks, and to take over-the-counter pain medication as needed. He recommended that McCutchen continue to work. Tr. 313.

On July 30, 2007, while working, McCutchen tripped and landed face-first on a steel bar. Tr. 287. That evening, McCutchen reported to the emergency room with a nosebleed that would not stop. Tr. 287. He denied experiencing any back pain, leg pain, or pain from walking. However, McCutchen described experiencing moderate pain in his face, and explained to the attending physician that he might have a facial fracture. Tr. 287. A CT revealed no fractures, but showed a small amount of blood in the left nasal passage. Tr. 231, 404. The emergency room physicians prescribed medication to stop the nosebleed, antibiotics, and twenty tablets of Vicodin. Tr. 290.

At McCutchen's next appointment with Dr. Cummings, August 2, 2002, there appeared to be no residual injury from the fall. Tr. 312. Dr. Cummings asked McCutchen to return for a follow-up appointment in several weeks and had no other recommendations. McCutchen was free to return to work without restriction. Tr. 312. Four days later McCutchen returned to Dr. Cummings, reporting a painful spasm in his left calf muscle. Dr. Cummings scheduled an appointment for August 9, 2009, and noted that McCutchen's face was healing. That day, McCutchen also attended a routine rectal exam. Tr. 278. During this visit McCutchen's physician documented that McCutchen walked with a slight limp. Tr. 278.

On August 9, 2007, McCutchen reported lingering pain from the back injury and requested more pain medication. Despite his pain, McCutchen's range of motion was within acceptable limits. Tr. 312. Dr. Cummings gave McCutchen samples of a pain medication called Ultram and scheduled an MRI for the following day. Tr. 312, 230, 403, 468. The MRI revealed that McCutchen suffered from mild protrusion of discs L3-4 and L5-S1, and moderate protrusion of L4-5, leading to the diagnosis of a herniated disc that compressed the L5 nerve root. Tr. 230.

McCutchen continued to take Vicodin to manage his pain. Dr. Cummings examined McCutchen on August 13, 2007, and again on August 23, 2007. During both of these visits, Dr. Cummings indicated that McCutchen's severe back pain and leg pain probably originated from the herniated disc. Tr. 311, 312. Dr. Cummings referred McCutchen to Dr. O'Neill for a surgical consultation, and instructed McCutchen to stay home. Tr. 311, 312.

On September 17, 2007, Dr. O'Neil recommended performing epidural steroid injections before considering surgery. He referred McCutchen to Dr. Fiks, a pain management specialist. Tr. 311, 356.

McCutchen requested a refill of his Vicodin prescription from Dr. Cummings on October 1, 2007. Tr. 311. Dr. Cummings prescribed two Vicodin daily to manage his pain. Tr. 311.

Dr. Fiks diagnosed a lumbar sprain or strain and administered a steroid injection on October 18, 2007. Tr. 335, 464. After this injection, McCutchen reported to Dr. Cummings on October 27, 2007 that he had experienced significant improvement since the injection and felt no more pain. Tr. 311.

McCutchen received a second injection on November 1, 2007, and on November 9, 2007, reported to Dr. Cummings that he felt well. Tr. 334, 463, 310.

On November 15, 2007, McCutchen received his third and last injection. Tr. 333, 462. On December 3, 2007, McCutchen reported to Dr. Cummings that his pain had returned. Tr. 310. This time, however, the pain emerged in his right leg. McCutchen described his pain to Dr. Fiks on December 10, 2007, as a constant, radiating pain that ached and drilled into his right leg and lower back. Tr. 329. Dr. Fiks observed that the functional limitations from the pain were severe; the pain interfered with most, but not all daily activities. Tr. 329. It also impeded

McCutchen's ability to sleep.  At this time, McCutchen was taking two to three Vicodin daily to alleviate the pain.  Tr. 331.

On December 27, 2007, Dr. Cummings gave McCutchen an additional prescription for Vicodin and advised him to sit with back support and avoid soft furniture.  Tr. 310.  McCutchen stopped attending physical therapy because the visits had not helped.  Tr. 310.

On January 3, 2008, McCutchen complained to Dr. Cummings about experiencing left shoulder pain, in addition to his existing back and leg pain.  Tr. 310.  McCutchen reported that when he slept on his shoulder, his fingers went numb, and pain went up his arm.  Tr. 310.  He also indicated that the pain radiated down his neck.  Tr. 309.  Dr. Cummings scheduled an MRI for both areas, and obtained an unenhanced MRI of his lumbar spine that day.  Tr. 309, 228, 400. The MRI revealed that discs L1-2 and L2-3 were normal, discs L3-4 and L4-5 had some mild to moderate degenerative change, and disc L5-S1 had moderately advanced degenerative change and  mild to moderate disc protrusion.  This disc protrusion was more prominent on the left side than the right, and the results suggested that McCutchen had some lower lumbar degenerative disc disease.  Tr. 229, 401.   However, there was no nerve root impingement.  Tr. 229.

On January 24, 2008, McCutchen underwent an MRI of his cervical spine.  Tr. 226.  The MRI showed that the alignment of the lumbar spine was within normal limits, that discs C2-3, C3-4, C4-5, and C7-T1 were likewise within the normal limits, and that disc C5-6 had some mild stenosis.  Tr. 226.  The degree of stenosis did not appear severe.  Tr. 227.  No abnormalities were seen post contrast imaging.  Tr. 227.

On February 11, 2008, Dr. Cummings examined McCutchen and observed that McCutchen's back pain was being managed by Neurontin, a medication prescribed by McCutchen's neurologist.  Tr. 309.  However, McCutchen reported that he continued to

experience leg pain. Tr. 309. To ease this leg pain, Dr. Cummings prescribed Ultram twice daily as needed, and advised that McCutchen continue the Neurontin. Tr. 309.

On February 12, 2008, an independent medical examiner, Dr. Rosenbaum, was retained by McCutchen's worker's compensation insurance agency to evaluate whether McCutchen still needed medical care for the herniated disc, and if surgery would be a medically reasonable treatment. Tr. 360. Dr. Rosenbaum reviewed all of McCutchen's medical records, and observed McCutchen's current condition. Tr. 355. He compared McCutchen's August 10, 2007 MRI to McCutchen's more recent MRIs from January 3, 2008, and January 24, 2008. Dr. Rosenbaum concluded that the herniated disc, which appeared on the August 10, 2007 MRI, had resolved. Tr. 359. Based upon this medical evidence, Dr. Rosenbaum determined that McCutchen had some degenerative arthritis in the lumbar spine, but that the limitations in his range of motion appeared to be non-physiologic. Tr. 359, 360. Before dismissing surgery entirely, Dr. Rosenbaum suggested that McCutchen obtain a lumbar myelogram to confirm the results of the January 2008 MRIs. Tr. 360.

On March 3, 2008, Dr. Cummings advised McCutchen to stop taking Ultram and instead recommended that he obtain a physical medicine consultation or complete additional physical therapy. Tr. 309. Dr. Cummings expressed his hope that McCutchen would return to work in some capacity. Tr. 309.

On April 7, 2008, Dr. Cummings documented that McCutchen no longer took Ultram but occasionally used a muscle relaxer. Dr. Cummings recommended that McCutchen take up to four Aleve tablets daily. Tr. 308.

Following Dr. Rosenbaum's suggestion, McCutchen obtained an additional CT and a lumbar myelogram on April 11, 2008. Tr. 350, 353. The lumbar myelogram showed some disc

space narrowing and endplate eburnation that was most pronounced at L5-S1, mild stenosis at L4-5, but no evidence of increased canal stenosis. Tr. 353-354. The new CT scan also showed mild degenerative changes that were most significant at L5-S1and that the exiting nerve roots at L5-S1 disc were severely affected by the bilateral foraminal stenosis. Tr. 351. Before the lumbar myelogram and CT scan results had been evaluated, McCutchen reported to Dr. Cummings that his back pain and leg pain had increased. McCutchen told Dr. Cummings that Ultram had not worked to alleviate his leg pain. Dr. Cummings then prescribed Vicodin to be taken every four hours. Dr. Cummings also wrote in his chart notes that McCutchen had been "disabled for about a year due to his back problems." Tr. 308.

On May 9, 2008, McCutchen complained to Dr. Cummings of pain in his legs, ankles, knee, hip and back. Neither the Vicodin, nor the Ultram, nor the electrical TENS unit had adequately managed this pain. Dr. Cummings switched McCutchen's pain medications to Percocet three times daily. Tr. 308. On May 16, 2008, McCutchen reported to Dr. O'Neil that he did not have much back pain, but still had pain in both legs. Tr. 234. Dr. O'Neil opined that McCutchen had significant foraminal stenosis at L5-S1 and suggested surgery as a possible solution. Tr. 234.

On June 3, 2008, McCutchen complained to Dr. Cummings of more pain in his hips and legs. Dr. Cummings prescribed Vicodin four times daily, and scheduled a follow up appointment in a month. Tr. 308. On June 17, 2008, Dr. Rosenbaum reviewed lumbar myelogram and CT scan taken on April 11 2008, and concluded that the these scans also showed no compression of the L1 or S1 nerve roots, and that the existing stenosis did not compress any nerve roots. Tr. 344. Based upon this finding, Dr. Rosenbaum concluded McCutchen's

symptoms were a result of the degenerative process, had a functional component, and that surgery would not benefit him. Tr. 345.

On July 3, 2008, McCutchen complained to Dr. Cummings of more back pain and asked for a refill of Vicodin. Tr. 307. Dr. Cummings renewed the prescription but asked him to decrease his consumption to two tablets daily. He also prescribed Celebrex and told McCutchen to discontinue Neurontin because it had no apparent benefit. Tr. 307.

On July 14, 2008, Dr. Cummings documented that McCutchen continued to consume three to four Vicodin daily. Dr. Cummings conferred with Dr. O'Neil about the possibility of performing surgery and both doctors expressly disagreed with Dr. Rosenbaum's conclusions and recommended surgery. Tr. 307. Dr. Cummings prescribed more Vicodin. Tr. 307.

On August 7, 2008, McCutchen reported to Dr. Cummings that his pain had increased since stopping the Neurontin. Tr. 307. Dr. Cummings prescribed more Neurontin and more Vicodin. Tr. 307.

On September 15, 2008, McCutchen explained to Dr. Cummings that he continued to have severe pain that required four Vicodin daily. Tr. 306. Dr. Cummings prescribed this medication. Then on September 29, 2008, McCutchen complained of experiencing sciatica and asked for even stronger pain medication. Dr. Cummings prescribed Ultram. Tr. 306.

September 30, 2008, was the date McCutchen was last insured for the purpose of determining Title II benefits.

It is clear from the record that McCutchen's condition deteriorated further after his date last insured. In November of 2008, McCutchen complained of more severe pain than he had ever felt before. Tr. 306. This pain continued to increase and eventually became so severe that activities like walking and sitting became difficult. Tr. 325, 452, 422. McCutchen claims that

on June 22, 2009, his leg pain increased to a point where he was unable to lift objects and that he could only walk short distances. Tr. 181. McCutchen regularly saw his pain management specialist after the date last insured and frequently changed his pain medications. Tr. 407-457. On November 15, 2010, upon request by McCutchen's counsel, Dr. Fiks wrote a report describing McCutchen's current symptoms and functional capacity. Tr. 490. This report indicated that by 2010, McCutchen was suffering from some very severe limitations. Tr. 491-497. In a letter to McCutchen's counsel, Dr. Cummings also asserted that McCutchen "has been unable to return to work since 8/14/07 due to a disability – sciatica." Tr. 308.

McCutchen's mental condition also deteriorated after his date last insured. The medical record and witness statements from his acquaintance Camilla Coder, his sister Janice, and his own statements indicate that he began experiencing severe depression. Tr. 390, 392, 393, 409, 443. McCutchen eventually became withdrawn and refused to visit his family. Tr. 212.

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law Judge found that McCutchen did not engage in substantial gainful activity during the period from his alleged onset date of August 4, 2007, through his date last insured, September 30, 2008. Tr. 20. Thus, she proceeded to the second step of the analysis.

At the second step, the ALJ held that before his date last insured, McCutchen's lumbar degenerative disc disease more than minimally impacted his ability to work, and thus was "severe" for the purposes of the Act. Tr. 20. Specifically, the ALJ found that the disease affected his ability to stand for extended periods and lift heavy objects. Tr. 20.

The ALJ also examined McCutchen's depression at this step, and found that it did not cause a severe limitation on McCutchen's ability to perform basic mental work activities. Tr. 20.

In making this finding, the ALJ considered how McCutchen's alleged impairment impacted four broad functional areas found in 20 C.F.R § 404, subpt P, app. 1. Tr. 21. She evaluated the medical records, McCutchen's own description of his impairment, his sister's description of his mental health, and the witness statement created by Ms. Coder, dated May 17, 2011. The ALJ accepted all of this evidence except for Ms. Coder's statement, which the ALJ excluded because Ms. Coder had only known McCutchen for a few months before his date last insured. Additionally, the ALJ rejected Ms. Coder's statement because it was inconsistent with the medical record and appeared to be describing McCutchen's condition after his date last insured.

After considering all of this evidence, the ALJ concluded that McCutchen's depression and anxiety only mildly limited the three functional areas, and that McCutchen experienced no episodes of decompensation before his date last insured. Tr. 21. In light of these facts and in accordance with 20 C.F.R. § 404.1520a(d)(1), the ALJ determined that McCutchen's mental impairment was not severe. Tr. 21.

At the third step of the five-step process, the ALJ found that none of McCutchen's impairments met or equaled the impairments enumerated in 20 C.F.R., § 404, subpt P, app. 1. The ALJ therefore conducted an assessment of McCutchen's residual functional capacity. Specifically, the ALJ found that during the relevant adjudication period McCutchen retained the capacity to work at a sedentary exertional level with an option to sit or stand at will. Tr. 24. The ALJ concluded:

> [McCutchen] can lift and carry a gallon of milk. [Additionally, McCutchen's] friend testified that the claimant fishes on a boat for sixty to ninety minutes at a time. Although the claimant can no longer use the sander or power tools, he is able to polish for an hour and a half and teach a one-hour class. The claimant testified at the hearing he can stand and walk for fifteen minutes and the residual functional capacity accommodates this alleged limitation by limiting him to sedentary work with an option to sit or stand at will.

Tr. 25.  In reaching this conclusion, the ALJ considered the objective medical evidence in the record, as well as  McCutchen's own statements, and the statements of his friend Mr. Abney.  Tr. 23-24.  The ALJ explained that according to his medical record, McCutchen's herniated disc had resolved, he had intact muscle strength, normal gait and station, and thus could sustain work activity if allowed to sit or stand at will.  Tr. 25.

At the fourth step, the ALJ found that in light of McCutchen's residual functional capacity, he was unable to perform past relevant work.  Tr. 25.

At the fifth step, the ALJ found that in light of McCutchen's age, education, work experience, and RFC there were jobs existing in significant numbers in the national and local economy that he could perform.  Tr. 26.  Relying in part on the testimony of an objective vocational expert, the ALJ cited examples of unskilled sedentary jobs that McCutchen could perform despite the limitations in his RFC, including compact assembler (1,500 jobs in Oregon; 60,000 jobs nationally), visual inspector (1,500 jobs in Oregon; 120,000 jobs nationally), and sorter (1,000 jobs in Oregon; 50,000 jobs nationally).

## ANALYSIS

McCutchen challenges the Administrative Law Judge's determination that he did not meet or equal a listed impairment enumerated in 20 C.F.R., § 404, subpt P, app. 1.  McCutchen argues that the ALJ failed to conduct a proper assessment of the medical evidence and give proper weight to his witnesses' testimony.  Specifically, McCutchen claims that the ALJ assigned too much weight to the medical evidence of examining physician Dr. Rosenbaum, while incorrectly discrediting the opinions of his treating physicians.  McCutchen also argues that the ALJ improperly rejected the lay opinion testimony of his sister Janice, misconstrued the testimony of his friend Mr. Abney, and ignored the witness statement prepared by Ms. Coder.

Because of the alleged errors made while evaluating all of this evidence, McCutchen asserts that the ALJ misconstrued his RFC. McCutchen maintains that he met his burden to prove a disability at step three of the five-step process, or in the alternative, that the Commissioner failed to meet her burden at the fifth step.

## I.    The Opinions of the Treating Physicians Were Not Improperly Rejected.

McCutchen maintains that the "ALJ ignored much of Plaintiff's treating providers' medical signs and laboratory information documenting Plaintiff's disabling limitations caused by his diagnosed spinal disorders." Pl. Br. at 21. These doctors include Dr. Cummings and Dr. Fiks. With regard to Dr. Cummings, McCutchen argues that the ALJ erred because she did not evaluate his record that McCutchen's depression increased after the date last insured. McCutchen also argues that the ALJ erred because she did not expressly consider Dr. Cummings' two notes that describe McCutchen as "disabled." Pl. Br. at 21-22. With regard to Dr. Fiks, McCutchen asserts that the ALJ erred by not considering his evaluation of McCutchen's residual functional capacity. Finally, McCutchen contends that the ALJ committed reversible error when she rejected both of these physicians' opinions and instead relied on the opinion of the examining physician Dr. Rosenbaum.

An ALJ need only discuss "significant probative evidence" in his or her findings. *See Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th Cir. 1984)(citations and quotations omitted). Probative evidence generally includes a claimant's medical record. In weighing a claimant's medical evidence the Commissioner generally affords enhanced weight to the opinions of the claimant's treating physicians. *See* 20 C.F.R. § 404.1527(d)(2). An uncontradicted treating physician's opinion may only be rejected for "clear and convincing" reasons supported by evidence in the record. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). If an examining or

treating physician's opinion is contradicted, an ALJ may reject it "by providing specific and legitimate reasons that are supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005), *citing Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

## A.     Dr. Cummings' Evidence Was Properly Evaluated.

First, McCutchen argues that the ALJ failed to assign proper weight to Dr. Cummings' observation that McCutchen's depression increased after his date last insured, and contends that the ALJ should have used this evidence to determine whether McCutchen's depression was a substantial impairment. The ALJ did not specifically evaluate this medical evidence in her finding. *See* Tr. 306 (describing McCutchen's increased depression). McCutchen asserts that the ALJ's failure to expressly evaluate Dr. Cumming's observation warrants reversal. I disagree.

The ALJ analyzed all of the medical records to determine the impact of McCutchen's mental impairment. She emphasized that McCutchen did not complain to Dr. Cummings about his increased depression until after his date last insured. Tr. 21. The ALJ also emphasized that during the time McCutchen was insured for the purpose of determining Title II benefit purposes, Dr. Fiks had rated all of McCutchen's psychiatric evaluations as "normal." The ALJ used this medical evidence to find that McCutchen's depression was not a substantial impairment prior to his date last insured. Evidence about McCutchen's increased depression after his date last insured is not probative, in that it does not materially relate back to the period of insurance. Since the ALJ made a rational interpretation of the relevant portions of the medical record using the relevant evidence, she did not err in concluding that McCutchen's depression was not a substantial impairment prior to McCutchen's date last insured. *See Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

Second, McCutchen argues that the ALJ should have discussed the fact that Dr. Cummings concluded that he was "disabled." Dr. Cummings made this conclusion twice: once in a chart note from April 2008, wherein Dr. Cummings wrote that McCutchen had been "disabled for about a year due to his back problems;" and a second time in a letter to McCutchen's counsel, where he opined that McCutchen "has been unable to return to work since 8/14/07 due to a disability – sciatica." Tr. 308, 391. I find that the ALJ's failure to expressly reject these opinions is not grounds for disturbing the Commissioner's final decision.

Dr. Cummings' notes did not reference any of McCutchen's specific impairments, nor did they tie Dr. Cummings' conclusion to the medical record during the relevant period. The ALJ used the relevant portions of the medical record to assess McCutchen's residual functional capacity. In evaluating his RFC, the ALJ considered specific facts in the medical record, including evidence that several medical providers had concluded that McCutchen's herniated disc had resolved, McCutchen's stenosis did not result in nerve root compression, he performed well during the physical examination, he appeared to have normal gait and station, and his muscle strength remained intact. Tr. 24-25. Applying this evidence, the ALJ found that McCutchen could work sedentary jobs if allowed to sit or stand at will. Her assessment of McCutchen's residual functional capacity, as gleaned from the medical evidence, implicitly contradicts Dr. Cummings' conclusion that McCutchen was "disabled." She made this implicit contradiction based on specific evidence in the medical record, and her failure to expressly reject Dr. Cummings' opinion was harmless error. *See Hamilton v. Comm'r of Social Sec. Admin.*, 368 Fed.Appx. 724 (9th Cir. 2010)(unpublished disposition)(holding that the ALJ's failure to expressly reject a physician's opinion that the plaintiff was "disabled" was harmless error).

///

OPINION AND ORDER - PAGE 18

**B.    Dr. Fiks' Evidence Was Properly Evaluated.**

McCutchen argues that the ALJ failed to discuss Dr. Fiks' assessment of his residual

functional capacity, and that this failure was reversible error. Pl. Br. at 34. McCutchen's counsel

asked Dr. Fiks to provide an assessment of McCutchen's condition through September 30, 2012.[3]

In response, Dr. Fiks completed an assessment on November 15, 2010. Tr. 489-497. Dr. Fiks

concluded that McCutchen had a residual functional capacity that left him unable to work. Tr.

489. Though the ALJ did not expressly address Dr. Fiks' assessment in her analysis, I find that

this is not reversible error.

The ALJ is only required to discuss significant probative evidence in her finding. See

*Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th Cir. 1984). Because Dr. Fiks did not relate

any portion of his assessment back to the medical record during McCutchen's period of insurance

Dr. Fiks' assessment is not significant probative evidence.

Dr. Fiks' assessment evaluated McCutchen's 2010 symptoms and 2010 RFC. This was

over two years after McCutchen's date last insured. The medical record shows that McCutchen's

condition declined steadily in the two years following McCutchen's date last insured; sometime

after September 30, 2008, McCutchen began to experience the worst pain that he had ever felt.

Tr. 306. This pain continued to increase. Tr. 325, 452. By October of 2009, activities like

walking and sitting began to aggravate his symptoms. Tr. 422. Given that McCutchen's

condition changed so dramatically after his date last insured, Dr. Fiks' 2010 functionality rating

for McCutchen is not probative. Since the ALJ is only required to discuss probative evidence,

---

[3]  McCutchen's counsel made a typographical error in their request for Dr. Fiks' assessment. On August 18, 2010, McCutchen's counsel sent Dr. Fiks a request that stated: "[c]laimant was last insured for Social Security Disability purposes on 9/30/2012. Please indicate the claimant's condition on or before that date." Tr. 490. In fact, McCutchen's date last insured was 9/30/08. Dr. Fiks completed his assessment of McCutchen's condition on November 15, 2010, and McCutchen's counsel received a copy of the letter on December 14, 2010. Tr. 490-497. In his assessment, Dr. Fiks describes McCutchen's then current functioning and fails to address his condition prior to the date last insured.

her failure to discuss the 2010 assessment is not grounds for disturbing the Commissioner's final decision.

**C.      Dr. Rosenbaum's Evidence Was Properly Credited.**

McCutchen argues that the ALJ improperly weighed Dr. Rosenbaum's medical opinions. He argues that the ALJ erred because she "failed to provide clear and convincing reasons for rejecting Plaintiff's treating physicians in favor of a one-time insurance consultative examiner" Pl. Br. at 22. This argument is unpersuasive.

If an examining or treating physician's opinion is contradicted, an ALJ may reject it "by providing specific and legitimate reasons that are supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005), *citing Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). In this case, there are divergent opinions in the medical record about the results of the CT scans and MRIs. Tr. 307. Dr. Rosenbaum opined that McCutchen's CT scans and MRIs showed no compression of the L1 or S1 nerve roots, and that the existing stenosis did not compress any nerve roots. Tr. 344. Thus, in Dr. Rosenbaum's opinion, he was not a good candidate for surgery. *Id.* Dr. O'Neil and Dr. Cummings disagreed with Dr. Rosenbaum about the results of the CT scans and MRIs, concluding that McCutchen was a good candidate for surgery. Tr. 307.

The ALJ provided specific and legitimate reasons for favoring Dr. Rosenbaum's opinion of the medical evidence. Specifically, she explained:

> [a]lthough the record reflects that Dr. O'Neil felt the claimant needed surgical intervention, several other physicians who evaluated the claimant and reviewed his diagnostic testing opined that the claimant was not a viable candidate for surgery.... Dr. Rosenbaum reviewed the additional records in June 2008, and again indicated the claimant was not an appropriate candidate for surgery, as his stenosis did not result in nerve root compression....Dr. Fiks also noted the claimant was not a good surgical candidate....Evidence of record also reflects that Dr. Yoo felt the claimant was not a good candidate for surgical intervention.

OPINION AND ORDER - PAGE 20

Tr. 24 (*citations omitted*). Three physicians, including one of McCutchen's treating physicians, disagreed with Dr. O'Neil's interpretation of the CT scans and MRIs. This is a specific and legitimate reason to discredit his opinion. The ALJ's reasoning for crediting the opinions of Dr. Rosenbaum, Dr. Fiks, and Dr. Yoo over that of Dr. O'Neil provided no grounds for disturbing the Commissioner's final decision.

## II.   There are No Errors in the ALJ's Evaluation of Lay Witness Testimony.

McCutchen next argues that the ALJ committed reversible error in evaluating the witness statements of Camilla Coder and Janice McCutchen, as well as the live testimony of Mr. Abney. For the reasons set forth below, I disagree.

Where more than one rational interpretation of lay witness testimony exists, the ALJ's interpretation must be upheld. *Morfan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). The ALJ is allowed to make determinations about a witness's credibility, and is not required to give the claimant an opportunity to explain away inconsistent statements and other factors that lead the ALJ to find the witness not credible. *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001). If an ALJ rejects the lay witness testimony, she "need only give germane reasons" for so doing. *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005), *citing Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). Providing testimony that is inconsistent with the medical record is considered a "germane" reason for discrediting a lay witness. *See id.*, *citing Lewis*, 236 F.3d at 511.

## A.   The Witness Statement Made by Camilla Coder was Properly Rejected.

Camilla Coder completed a witness statement form on May 19, 2011. Tr. 209. On the form, Ms. Coder indicated that she met the McCutchen three years prior, which suggests that she had only known him for a few months before his date last insured. Tr. 209. Other than this

information, her relationship to McCutchen remains unclear. The ALJ assigned little weight to this witness's testimony. McCutchen now contends that the ALJ should have given Ms. Coder's statement more weight. I disagree, and find that the ALJ rejected Ms. Coder's statement for two legitimate reasons.

One reason that the ALJ assigned little weight to the statement is that Ms. Coder described McCutchen's current condition and not his condition prior to his date last insured. Tr. 21. Since Ms. Coder had not known McCutchen for much time prior to his date last insured, the ALJ assigned little weight to the witness statement, and explained that Ms. Coder's observation of McCutchen's condition in 2009 couldn't sufficiently determine his condition during the relevant period. Tr. 21. This credibility designation was specific, germane, and within the ALJ's discretion. *See Morgan v. Sullivan*, 945 F.2d 1079 (9th Cir. 1991)(holding that the claimant must prove that he was disabled before his date last insured).

The ALJ also rejected Ms. Coder's testimony because Ms. Coder seemed to exaggerate the nature of McCutchen's impairments. An ALJ may discredit testimony that conflicts with medical records. *See Vincint v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984). If the ALJ had fully credited Ms. Coder's testimony, McCutchen would have met the listing of impairments for 1.04 (disorders of the spine), 11.04 (central nervous system vascular accident), 11.07 (cerebral palsy), 12.04 (affective disorders). The ALJ found that the medical evidence did not vindicate these claims. The fact that a lay witness seems to have exaggerated the evidence is a valid reason to reject his or her testimony. *See Thomas v. Barnhart*, 278 F.3d 947, 960 (9th Cir. 2002). Thus, the ALJ's rejection of Ms. Coder's statement does not warrant reversal.

///

B.    **The ALJ Properly Evaluated Janice's McCutchen's Testimony.**

McCutchen's sister Janice completed a witness statement form on May 5, 2011 that described McCutchen's lifelong battle with depression. In this report, she states that from 2002-2009, Robert "was doing well....[h]e remained on his medication and appeared to be making progress." Tr. 201. In her finding, the ALJ relied upon Janice's observation about McCutchen doing well during the relevant time period as evidence that McCutchen's depression did not substantially affect his ability to work. Tr. 21. McCutchen now argues that Janice mistakenly testified to an incorrect depression onset date, and that the ALJ should have noticed this mistake. McCutchen concludes that the ALJ relied on this mistake to mischaracterize Janice's testimony, and asks this court to find that the ALJ's mischaracterization warrants reversal. Pl. Br. at 22.

Janice described observing McCutchen's mental condition decline in 2009. Under a header paragraph marked with the period of years from "2009-2012", she states:

> At one point Robert injured his back at work and started receiving workers [*sic*] compensation.... He did not manage the lump sum payment well, with the exception of paying off his fines, getting his drivers [*sic*] license and purchasing an older used automobile. With in [*sic*] 6 months he no longer had any form of income and found it difficult to work with the pain in his legs and back. He became depressed and withdrew to the back bedroom.

Tr. 201-202. McCutchen argues that Janice meant to write that McCutchen became depressed after his back injury in 2007, not 2009. Pl. Br. at 27. This interpretation of Janice's statement seems unlikely. Even if it were a rational interpretation, it is not the *only* rational interpretation of Janice's statement. Janice could have meant to say that McCutchen became depressed in 2007, when he injured his back. However, she directly states that the onset date was 2009. Where more than one rational interpretation exists, the ALJ's perception of the evidence must be upheld. *Morfan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 599, (9th Cir. 1999). Since the ALJ's interpretation is rational, there is no error.

C.   **The ALJ Properly Evaluated Mr. Abney's Testimony**

Before the Administrative Law Judge on May 25, 2011, Mr. Abney testified that he had been McCutchen's longtime friend and had observed his condition since McCutchen stopped working. Tr. 52. Mr. Abney described the special accommodations McCutchen required to attend their annual fishing trip. Tr. 53. He also described McCutchen's volunteer work at Camp Hancock, where Mr. Abney and McCutchen teach a thunder egg class once a year. Tr. 58. The ALJ found that these statements supported McCutchen's RFC. McCutchen now contends that the ALJ failed to show how these activities transferred to a work setting and argues this failure is reversible error. I find that the ALJ properly evaluated Mr. Abney's testimony.

A claimant need not "vegetate in a dark room" to be eligible for benefits. *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1999). It is not the court's job to penalize claimants "for attempting to lead normal lives in the face of their limitations." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). However, the court may use testimony about a claimant's activities to discredit the allegation of a totally debilitating impairment, even when the testimony suggests some difficulty in functioning. See *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010) (discrediting a claimant's totally disabling back pain to the extent that it contradicted his activities on his ranch); *see also Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009) (holding that an ALJ properly used the claimant's community activities and gardening to prove that he had some ability to "rally" and work); *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) (holding that the ALJ could use evidence of the claimant's daily activities, including going on walks and attending church to show that she was able to work with people occasionally). Performing some activities "may be seen as inconsistent with the presence

of a condition which would preclude all work activity." *Curry v. Sullivan*, 925 F.2d 1127, 1130 (9th Cir. 1990) *citing Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir.1989).

In the present action, the ALJ held that Mr. Abney's testimony supported her conclusion that McCutchen was not totally disabled, given the activities he could perform while suffering from back pain. She explained that certain activities McCutchen could perform supported this conclusion, including McCutchen's ability to lift and carry a gallon of milk, drive for forty-five minutes, fish on a boat for ninety minutes at a time, polish thunder eggs for an hour and a half, and teach an hour-long lapidary class. Tr. 25. Mr. Abney illustrated that McCutchen could sit or stand and focus on a task despite his limitations. The ALJ found this testimony inconsistent with the presence of a condition that would preclude McCutchen from all work activity. Her decision was supported by the record.

## III.    McCutchen Did Not Prove a Debilitating Impairment at Step Three.

McCutchen argues that he met his burden of proving a listed disability at step three of the five-step process and should be awarded benefits. McCutchen makes two arguments to assert that he met his burden. First, he argues the ALJ misconstrued the requirements of Listing 1.04 in 20 C.F.R. § 404, subpt. P, app. 1. McCutchen believes that his burden would have been met had the proper standards been evaluated. Second, McCutchen argues that if the ALJ had properly considered the evidence of his depression, then his condition would have equaled a listed impairment.

To meet the requirements for Listing 1.04 (disorder of the spine), a claimant must prove that he or she has a spinal condition resulting in a compromise of a nerve root (including the cauda equina) or the spinal cord. Additionally, the claimant must show:

> (A.) Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle

weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is
involvement of the lower back, positive straight-leg raising test (sitting and supine); or
(B.) Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue
biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or
painful dysesthesia, resulting in the need for changes in position or posture more than
once every 2 hours; or
(C.) Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on
appropriate medically acceptable imaging, manifested by chronic nonradicular pain and
weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

1.04 in 20 C.F.R. § 404, subpt. P, app. 1.  The ALJ held that the claimant did not meet this

requirement because "imaging studies and other clinical assessments do not reflect findings

consistent with descriptions identified in this Listing. Imaging studies do not show nerve root

impingement." Tr. 22.

McCutchen misunderstands the ALJ's finding and incorrectly argues that the ALJ held

that McCutchen did not meet the listing because he did not show an abnormal gait. Pl. Br. at 19.

McCutchen characterizes this purported error as a "gross misinterpretation of SSA's own

Listings." *Id.* However, the ALJ did not solely rely on a diagnosis of McCutchen's gait in

reaching her conclusion.  The ALJ made her finding based in part upon McCutchen's imaging

studies, which showed no nerve root impingement.  These imaging studies establish that

McCutchen's condition does not meet the criteria for the listed condition.  Thus, McCutchen's

argument is unfounded.

Next, McCutchen argues that he would have equaled a listed impairment if the ALJ had

considered the combined effect of his mental and physical impairments.  Contrary to

McCutchen's assertion, the ALJ's decision did consider both of the McCutchen's alleged

impairments, but found that his mental impairments did not satisfy paragraph B of the functional

criteria. Tr. 21.  As discussed, the ALJ properly credited Janice's observations about

McCutchen's depression, and consistent with this testimony found that the McCutchen was

"doing well" within the relevant period. Tr. 21. Based on this testimony and the medical record, the ALJ found that the evidence did not support a severe impairment, and that his depression did not limit McCutchen from performing basic work activity during the relevant period. Tr. 21. Thus, she properly concluded that the McCutchen did not meet his burden in proving his condition equaled a listed impairment. For the foregoing reasons, McCutchen did not meet his burden at the third step.

## IV.   The Commissioner met her Burden at Step Five.

McCutchen argues that the Commissioner failed to meet her burden at step five of the sequential process for two reasons. First, McCutchen argues that by failing to fairly evaluate lay witness testimony and the medical record, the ALJ created an unrealistic RFC. Second, McCutchen argues that the ALJ's hypotheticals to the vocational expert failed to include McCutchen's mild limitations in concentration, persistence and pace.

Because I have found no error in the ALJ's evaluation of the evidence from Dr. Cummings, Dr. Fiks, Dr. Rosenbaum, Ms. Coder, Janice McCutchen, and Mr. Abney, I reject McCutchen's first argument. The ALJ used the medical record and lay witness statements to support her determination of McCutchen's RFC. Because I find no error in the witness testimony above, I agree with the ALJ's evaluation of McCutchen's residual functional capacity – during the period of insurance, McCutchen could have worked a sedentary job if he had the option to sit or stand.

Finally, McCutchen contends that the ALJ should have added a limitation in her hypothetical to the vocational expert that reflected a deficiency in concentration, persistence, or pace. Pl. Br. at 33. I reject McCutchen's argument.

In the present action, the ALJ considered the four broad functional areas set out in the disability regulations for evaluating mental disorders. *See* 20 C.F.R., § 404, subpt P, app. 1. The four functional areas that the ALJ assessed were activities of daily living; social functioning; limitations in concentration, persistence, and pace; and decompensation. The ALJ found that during the relevant period, McCutchen's mental impairment did not affect his capacity to perform activities of daily living, nor did he experience any limitations in his social functioning. She also found that he had not experienced any episodes of decompensation. Tr. 21. With regard to limitations in persistence, concentration, and pace, the ALJ found that McCutchen had only experienced a mild limitation, in that he occasionally had difficulty sleeping. Tr. 21. However, his mental status examination was normal. Tr. 21.

Since the ALJ found that McCutchen only had a mild mental impairment that presented no significant interference with his ability to perform basic work activities, she was allowed to omit McCutchen's limitation in persistence, concentration and pace from her hypothetical questions to the vocational expert. *See Osenbrock v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001)(holding that an ALJ is free to omit mild mental limitations from his or her hypothetical questions to the vocational expert). Thus, I find that the ALJ's questions were properly formed and that the Commissioner met her burden at the fifth step.

## CONCLUSION

For the reasons set forth above, the Commissioner's final decision is AFFIRMED. A final judgment shall be prepared.

Dated this 7th day of August, 2013.

Honorable Paul Papak
United States Magistrate Judge

OPINION AND ORDER - PAGE 28